# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 18-929V
### Filed: August 22, 2024

|  |  |
|---|---|
| LIGIA GAIRDO,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Special Master Horner |

*Ramon Rodriguez, III, Sands Anderson, PC, Richmond, VA, for petitioner.*
*Austin Joel Egan, U.S. Department of Justice, Washington, DC, for respondent.*

### DECISION[1]

On June 28, 2018, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that she suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from her August 20, 2015 pneumococcal conjugate vaccination.  (ECF No. 1.)  For the reasons discussed below, I now find that petitioner is *not* entitled to compensation.

## I.      Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines.  In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute;

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

received it in the United States; suffered a serious, long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a causal link between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1)(A); § 300 aa-11(c)(1)(C)(i); § 300aa-14(a); § 300aa-13(a)(1)(B).

The Vaccine Injury Table lists a Shoulder Injury Related to Vaccine Administration or "SIRVA" as a compensable injury if it occurs within 48 hours of vaccine administration. § 300aa-14(a), *amended by* 42 C.F.R. § 100.3. Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAIs"), which provide more detailed explanation of what should be considered when determining whether a petitioner has suffered an injury listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(c). To be considered a "Table SIRVA," petitioner must show that her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question. § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii). To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly ex rel. Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and non–Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence". § 300aa-13(a). That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence . . . ." *Moberly*, 592 F.3d at 1322 n.2. Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 872-73 (Fed. Cir. 1991). However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-11(c)(1). Once a petitioner has established their *prima facie* case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination. *Althen*, 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

## II.    Procedural History

At the time the petition was filed, petitioner was represented by a different attorney. Initially, this case was assigned to the Special Processing Unit for potential informal resolution based on the allegations of the petition. (ECF No. 5.) Petitioner filed an affidavit marked as Exhibit 1 and medical records marked as Exhibits 2-8. (ECF Nos. 1, 9, 13.) Respondent filed his Rule 4 Report in May of 2019. (ECF No. 21.) Respondent addressed two issues. First, respondent contended that petitioner had not substantiated a shoulder injury consistent with a Table SIRVA or otherwise established causation-in-fact for a shoulder injury. (*Id.* at 9-12.) Second, respondent acknowledged that petitioner did appear to have suffered some form of localized reaction to her vaccination, but contended that the reaction was too short-lived to be compensable under the Vaccine Act's severity requirement. (*Id.* at 12 (citing § 300aa-11(c)(1)(D)).)

Following respondent's filing of his report recommending against compensation, the case was reassigned to another special master in June of 2019.  (ECF Nos. 22-23.)  That special master directed petitioner to file a further affidavit better explaining the onset of her symptoms.  (ECF No. 24.)  After a number of extensions of time, petitioner eventually filed two affidavits in December of 2019, one of her own and one by her husband, Rafael Gil.  (ECF No. 35; Exs. 9-10.)  In the interim, the case was reassigned to the undersigned and petitioner's current counsel was substituted as counsel of record.  (ECF Nos. 27-28, 32.)  During the spring of 2020, petitioner filed additional medical records marked as Exhibits 11-15.  (ECF Nos. 38, 42, 47, 52.)  Petitioner filed an amended statement of completion on May 1, 2020.  (ECF No. 54.)

Following petitioner's filing of her statement of completion, I held a status conference.  (ECF No. 55.)  I advised that, based on my review of the records, it appeared that petitioner experienced a temporary post-vaccination cellulitis, but that there was no evidence to support her alleged shoulder injury until after a reported traumatic fall.  (*Id.* at 1.)  There was also evidence that petitioner had a potentially confounding cervical radiculopathy.  (*Id.*)  However, because petitioner was still seeking further diagnostic assessment from her treating physicians, I permitted her time to determine how she would like to proceed.  (*Id.* at 2.)  Petitioner then filed additional medical records between November of 2020 and July of 2021.  (ECF Nos. 59, 64, 69, 75; Exs. 16-22, 25.)  She also filed an expert report by orthopedic surgeon Daniel Carr, M.D., in June of 2021.  (ECF No. 71; Exs. 23-24.)  Respondent then filed a responsive report by orthopedic surgeon Paul Cagle, M.D.  (ECF Nos. 77-78; Ex. A.)

I held a Rule 5 status conference in December of 2021.  (ECF No. 79.)  I advised that, "[u]pon my review of the medical records, the nature of petitioner's complaints post-fall is distinct from the nature of petitioner's complaints post-vaccination.  For this reason, I am not persuaded on the current record that Dr. Carr's expert opinion identifying a post-vaccination SIRVA immediately after petitioner's August 20, 2015 vaccination was reliably reached."  (*Id.* at 1.)  Petitioner requested an opportunity to have Dr. Carr write a report in response to Dr. Cagle's report.  I indicated that "I have some concerns, however, that especially in light of what the contemporaneous medical records of 2015 and 2016 reflect, Dr. Carr's assessment may ultimately rely upon petitioner's account of her history while her medical records suggest reason to doubt her credibility as a historian."  (*Id.* at 2.)

The parties attempted to resolve the case informally, but were unable to do so.  Therefore, a fact hearing was held on March 20, 2023.  (Transcript of Proceedings ("Tr.") at ECF No. 103.)  In the lead up to the hearing, petitioner filed additional medical records marked as Exhibits 26-28 and witness affidavits marked as Exhibits 29-31.  (ECF Nos. 89, 97.)  During the hearing, petitioner and four additional witnesses testified – her husband, Rafael Gil; her sister, Yolanda Evans; her daughter, Mary Gairdo; and her granddaughter, Marai Gairdo.  During the hearing, additional materials were identified and later filed as Exhibits 32-34 – two letters by treating physicians and a referral for physical therapy.  (ECF No. 100.)  I allowed the parties to determine whether they wished to have their experts review the transcript of the hearing and advised that

once the record was complete, I intended to resolve the case based on written submissions pursuant to Vaccine Rule 8(d).  (ECF No. 99.)

In August of 2023, petitioner filed a supplemental report by Dr. Carr (Exs. 35-51) and then a motion for a ruling on the written record.  (ECF Nos. 106-09.)  Respondent then filed a responsive report by Dr. Cagle (Exhibit B) in October of 2023 and a response to the motion for a ruling on the record in November of 2023.  (ECF Nos. 112, 114.)  Petitioner filed a further supplemental report by Dr. Carr (Exhibit 52) in December of 2023, and filed her reply brief on January 19, 2024.  (ECF Nos. 116, 120.)

In light of the above I have determined that the parties have had a full and fair opportunity to present their cases and that it is appropriate to resolve this issue without a hearing.  *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").  Accordingly, this matter is now ripe for resolution.

## III.   Factual Summary

### a.  Medical Records

Petitioner received the vaccination at issue at her primary care provider's office on August 20, 2015.  (Ex. 2, pp. 78-84.)  She was 65 years old at the time.  (*Id.* at 78.)  Respondent stresses that petitioner had a number of preexisting issues (ECF No. 114, pp. 1-2); however, petitioner stresses she had no complaints of left shoulder pain at the time (ECF No. 109, p. 6).  Petitioner's complaints at the time of vaccination did include back and neck pain, as well as muscle cramps throughout her body.  She was concerned she might have fibromyalgia.  (Ex. 2, pp. 82-83.)

On August 26, 2015, petitioner returned to her primary care provider.  (Ex. 2, pp. 99-105.)  The history indicates that petitioner "felt poorly" the evening of her vaccination.  Thereafter:

> Next day, claimed she had 102 temps for 3 days with significant myalgias in the overwhelming fatigue, some mild discomfort in her left arm, Sunday and Monday noted swelling and erythema of the arm, still feeling of ill being, marked fatigue.  Fevers went away.  Still continues to have myalgias.  Exam today shows a diffuse erythema from the deltoid to just proximal to the elbow warm to touch.  No pustules, no rash.  She has no fever.  She has no other systemic hot swollen joints.  She does complain of severe fatigue.  I believe that this is most likely an allergic reaction to Prevnar 13; however, with the fevers, I am concerned it might have been a local cellulitis at the injection site, although that is not visible at this time.  I am going to treat her empirically with Keflex 500 t.i.d. for 5 days, prednisone taper starting at 60 mg and tapering 10mg daily.  I put AN ALLERGY TO PNEUMOVAX in her chart.

(*Id.* at 99-100.)  The nursing note additionally indicates that petitioner reported having the worst headache she had ever had.  (*Id.* at 102.)  Petitioner was diagnosed as having both an allergic reaction and a left arm cellulitis.  (*Id.* at 99.)

On September 9, 2015, petitioner presented to the emergency department with complaints of occipital headache, cervical pain, and left foot pain.  (Ex. 3, p. 46.)  The history of present illness similarly describes petitioner's vaccine reaction as including fever and malaise, along with swelling and redness at the injection site.  She indicated that her malaise, tiredness, and myalgias had persisted.  It then continues: "the last 3 days she developed nontraumatic neck pain, the pain is on both side of her neck goes down to the trapezius muscle groups[.]  [I]t is significantly worsened with any attempted movement of her head, per the patient it feels different than muscle spasm[s.]"  (*Id.*)  "Her neck pain does not radiate into her arms and she has no weakness of her arms."  (*Id.*)  Petitioner also discussed new onset of ankle pain, as well as her prior history of disabling lower back pain.  It was noted that her primary care provider does not agree that she has fibromyalgia.  (*Id.*)  A review of petitioner's symptoms identified only neck pain under musculoskeletal and pain radiating up to her head from her cervical spine under neurologic.  (*Id.* at 47.)  Musculoskeletal exam indicated, "Normal range of motion, Normal strength, No tenderness, No swelling, No deformity, Normal gait, She has no weakness of upper or lower extremities[,] no numbness[,] no tingling."  (*Id.*)  A brain CT scan was normal, and a cervical spinal CT showed "a lot of arthritic changes."  (*Id.*)  Petitioner was diagnosed with a cervical strain and directed to follow up with her primary care provider.  (*Id.* at 48.)

On September 16, 2015, petitioner returned to her primary care provider.  (Ex. 2, pp. 107-11.)  The history indicates she was presenting to follow up regarding "neck and arm pain."  (*Id.* at 107.)  After describing petitioner's initial reaction in her left arm, the history indicates "[s]he did well until 3 days after meds completed when she developed neck stiffness mid-day.  It felt better later that day.  The next day it was much worse with pain in neck going into left shoulder and upper arm.  No numbness or tingling."  (*Id.*)  It is noted that the emergency department found cervical spine arthritis on CT scan and "[s]he continues with deep muscle pain in left arm and neck pain.  Stiffness is a bit better."  (*Id.*)  On physical exam, petitioner's cervical spine "exhibits decreased range of motion and tenderness.  She exhibits no bony tenderness, no swelling and no edema."  (*Id.*)  Further, the "[l]eft posterior cervical muscles are very tense and tender.  Right trapezius tense.  Restricted right side bending and left rotation."  (*Id.* at 108.)  Petitioner was diagnosed with cervical muscle pain and referred to physical therapy.  (*Id.*)

Petitioner had an initial physical therapy evaluation on September 18, 2015.  (Ex. 5, p. 8.)  The history indicates that petitioner reported:

> about a month ago start[ed] having neck discomfort and not sure what caused this.  Patient notes she received a pneumonia shot about a week before so not sure if this is related.  Patient notes sleeping is okay, very stiff

in the morning.  Patient is having a difficult time moving her neck without pain.  Patient notes ADLs she gets very sore with activities.

(*Id.*)  On physical exam, petitioner had reduced cervical extension and rotation bilaterally with tightness, pulling, and soreness.  She had tightness in the upper trapezius, levator, and pectoral muscles, as well as tenderness into the scalenes, cervical paraspinals, upper trapezius, levator, and into the thoracic paraspinals and inter scapula musculature.  (*Id.*)  8-12 sessions of therapy were recommended.  (*Id.*)  However, petitioner was discharged from physical therapy with a home exercise program on October 17, 2015, after only six sessions, because she had met her therapy goals.  (Ex. 5, pp. 1-2.)  She was noted to be "doing better with minor soreness depending on activities" and her cervical range of motion was within functional limits but "with end range tightness."  (*Id.*)

On November 19, 2015, petitioner returned to her primary care provider.  (Ex. 2, pp. 112-19.)  The reason for the visit was "3m follow up on muscle pain" as had been discussed at her prior appointment; however, a number of petitioner's chronic conditions, though not any complaints of neck or shoulder pain, were discussed.  (*Id.* at 112-13.)  Physical exam noted only that she had no hot or swollen joints or peripheral edema of her extremities.  (*Id.* at 113.)  Petitioner was to return for a check up in six months.  (*Id.*)

Petitioner presented to the emergency department on December 25, 2015, after twisting her left knee.  (Ex. 3, p. 91.)  The history focused only on her knee with no discussion of any other complaints.  Neither Review of Systems or Physical Examination included any notations regarding her neck or shoulders.  (*Id.* at 92.)  She was instructed to follow up with an orthopedist, though there is no indication she did.  (*Id.*)

On February 23, 2016, petitioner presented to an orthopedist for complaints of lower back pain that had been chronic since an accident in 2009.  (Ex. 6, pp. 7-8.)  Physical exam and imaging were focused on the lower back.  (*Id.* at 8.)  The Review of Systems noted only broadly that petitioner "has a history of [j]oint [p]ain, muscular weakness and muscular pain."  (*Id.* at 7.)  No mention of neck or shoulder pain is made.  Petitioner was diagnosed with degenerative disc disease of the lumbar spine.  (*Id.* at 8.)

Petitioner returned to her primary care provider on May 16, 2016, for a routine physical.  (Ex. 2, pp. 120-28.)  Physical exam notes that she "has some osteoarthritis" of the extremities, but nothing in the encounter record discusses either neck or shoulder pain or any purported ongoing sequela of her vaccine reaction.  (*Id.*)  A number of unrelated issues were discussed.  (*Id.*)  Petitioner returned for a follow up on her lab work on August 25, 2016.  (*Id.* at 129-39.)  The visit diagnoses included cervical muscle pain, but neither neck nor shoulder pain is otherwise discussed during the encounter.  (*Id.*)  A number of unrelated conditions, including petitioner's lower back pain, were discussed.  (*Id.*)

Petitioner returned on December 5, 2016, for follow up regarding her hypertension and hyperlipidemia.  (Ex. 2, p. 140-44.)  She complained *inter alia* of "various myalgias, arthralgias, out of proportion to her physical findings" and the nursing note further indicates that she "still reports effects from reaction to prevnar vaccine." (*Id*. at 144.)  Physical exam documented "some symmetrical osteoarthritis without peripheral edema."  (*Id*.)  The doctor ordered lab work, but did not making any changes to medication and again recommended following up in six months.  (*Id*.)

Petitioner returned to her primary care provider on February 14, 2017.  (Ex. 2, pp. 156-60.)  The reason for the visit was "left arm pain."  (*Id*. at 156.)  The history of present illness explained:

> The patient presents today for a variety of reasons.  Her chief complaint is that she is having discomfort in her left arm apparently while bathing her mother who is quite infirmed and basically wheelchair bound.  She fell in the bathroom, landing on her elbow and putting a posterior lateral force through her shoulder.  She is now unable to abduct her arm even to 90 degrees without significant pain with active range of motion.  With passive range of motion, I could not really get it up to 90 degrees without significant discomfort.  She also continues to complain of discomfort in the arm and [thinks] that her left arm is larger than her right arm after having a pneumococcal pneumonia vaccine quite some time ago.  She also complaints of fibromyalgia . . . .

(*Id*. at 156.)  The nursing note indicates: "Pt presents today for pain in left arm.  Pt feels that she has fibromyalgia.  Pt states pain as been going since getting the pneumonia shot.  She has been to PT.  Pt says that it hurts worse when she goes to sleep."[3] (*Id*. at 159.)  Physical exam noted that "[s]he did not appear in acute distress at rest, but with movement on the left upper extremity she winced and withdrew stating that there was severe pain with adduction of the arm.  The arms looked the same and symmetrical to me."  (*Id*. at 156.)  The initial impression was a supraspinatus rotator cuff tear and an MRI was ordered.  (*Id*.)

Petitioner underwent a left shoulder MRI on February 17, 2017.  (Ex. 7, pp. 111.) Due to claustrophobia, an open magnet was used which resulted in a "less than optimal" study.  (*Id*.)  The MRI showed (1) "a partial tear of the supraspinatus tendon in the critical zone without tendon retraction or muscle atrophy" and (2) "[m]oderate degenerative disease of the acromioclavicular and glenohumeral articulations."  (*Id*.)

Petitioner then presented to an orthopedist on February 24, 2017.  (Ex. 6, pp. 2-4.)  The history indicates petitioner "sustained a fall, landed on the left shoulder.  Having left shoulder pain.  Sent by her PCP.  Said she is having pain in the neck, pain that

---

[3] To the extent petitioner associates her pain to the fibromyalgia she suspected, it should be noted that petitioner was expressing concern for fibromyalgia at the very appointment at which she received the vaccination.  (Ex. 2, p. 82.)  To the extent she associates her pain with her prior physical therapy, the records reflect that physical therapy was related to her cervical spine.  (Ex. 5.)

radiates even to the contralateral shoulder, pain that radiates down the left arm down into the hand and fingers." (*Id.* at 2.) (The review of systems was the same as at her prior orthopedic encounter for her lower back pain. (*Compare* Ex. 6, p. 3, *with* Ex. 6, pp. 7-8.)) On physical exam, petitioner had full strength, but reduced active range of motion in the shoulder. She also had full range of cervical motion, but pain with the Spurling test.[4] (*Id.* at 3.) The orthopedist noted that the MRI showed only low grade partial thickness tearing, deeming the rotator cuff "essentially normal," though noting the limitations of the study. In contrast, x-ray of the cervical spine showed extensive spondylosis. Accordingly, petitioner was diagnosed with "[c]ervical spondylosis, glenohumeral arthritis and cervical radiculopathy." (*Id.*) Physical therapy was again recommended, and a spinal MRI would be considered if symptoms did not improve. (*Id.* at 4.) Petitioner would later report to her primary care provider in September of 2017 that she had completed physical therapy during May and June. (Ex. 7, p. 19.)

Beginning in September of 2017, petitioner began seeing a new primary care physician. (Ex. 7, pp. 19-27.) During an encounter of September 14, 2017, petitioner reported, in addition to other complaints, that she was "sore all over" and had "pain radiating from her ears to her neck to her spine and all the way down to her toes. She feels that the muscles in her neck are all stiff. She hurts all over." She also stated that she "has a lot of pins and needles feelings in her hands and upper back. She completed physical therapy in May and June as advised by her orthopedic. Despite these interventions she continues to have chronic pain." (*Id.* at 19.) The nursing note further indicates that petitioner "states she has fibromyalgia. Patient states she has been having left arm, back of neck, and lower back pain which has been ongoing for months." (*Id.* at 22.) Petitioner's physical exam was positive for trigger points and fibromyalgia was added to her list of diagnoses. (*Id.*) She was prescribed Cymbalta on a trial basis for the fibromyalgia. (*Id.*) She would later report discontinuing the Cymbalta after one week due to dizziness. (*Id.* at 28.)

On November 2, 2017, petitioner reported to her primary care physician that:

She is worried about her chronic myalgias. She's not sure she believes she has a diagnosis of fibromyalgia. She thinks this is all related to a Prevnar vaccine then she had giving her permanent issues with her muscles. She would like me to write a letter in that regard to the manufacturer and have them pay for her physical therapy. She does want to continue to have physical therapy and requests that I do order additional sessions. This is for diffuse body pain.

(Ex. 7, p. 36.)

---

[4] When conducting the Spurling test for cervical radiculopathy, the examiner presses down on the top of the head while the patient rotates the head laterally and into hyperextension, and pain radiating into the upper limb ipsilateral to a rotation position of the head indicates radiculopathy. *Spurling test*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=112983 (last visited Aug. 19, 2024).

Petitioner returned for follow up of her various issues on February 5, 2018, placing her broader muscle complaints, along with her left arm complaints, in the context of a post-vaccine reaction.  (Ex. 11, pp. 73-74.)  As of March 17, 2020, petitioner began pushing her orthopedist to conduct a left shoulder MRI to support her injury claim.  (Ex. 15, pp. 1-3.)  He did not agree, and did not agree an injury was likely, but did agree to refer petitioner for an EMG.  (*Id.* at 3.)  Petitioner subsequently had a normal nerve conduction study, but did not complete the EMG.  (Ex. 16, p. 3.)  Thereafter, petitioner continued to press for an MRI, which the orthopedist ordered "unwillingly."  (Ex. 17, pp. 1-2.)  The MRI showed mild to moderate rotator cuff tendinopathy, as well as acromioclavicular and glenohumeral arthritis.  (*Id.* at 13-14.)

Petitioner had an orthopedic surgery consult.  Based on the MRI results, petitioner was diagnosed with primary osteoarthritis of the left shoulder.  (Ex. 17, p. 11.)  She was not viewed as a candidate for a shoulder replacement and conservative measures were recommended.  Petitioner did not want to pursue conservative measures, and so a second opinion was recommended.  It is documented that petitioner did not seem to understand the nature of her shoulder condition.  (*Id.* at 12.)  When she went for a second opinion, surgery was agreed to, though petitioner was cautioned "we may find more severe arthritis than her imaging indicates and be unable to treat the rotator cuff surgically."  (Ex. 21, p. 28.)  On January 29, 2021, petitioner underwent shoulder surgery.  (*Id.* at 76-77.)  Petitioner had degenerative changes, but an intact rotator cuff.  (*Id.* at 77.)  As discussed below, petitioner does not believe the surgery alleviated her symptoms.

### b.  Witness Testimony

#### i.  Petitioner

Petitioner testified that, prior to vaccination, her "health was excellent," and she had no condition that was concerning to her.  (Tr. 77-78.)  She indicated that "I just didn't have nothing to worry about my health," noting that she had energy, a clear mind, and was a workaholic.  (*Id.* at 78-79; *see also id.* at 126-27.)  On cross-examination, petitioner was specifically asked if she had any prior back pain and she said no.  (*Id.* at 127-28.)  Petitioner denied having fibromyalgia and denied ever having reported having fibromyalgia.  (*Id.* at 144-45.)  She denied having any osteoarthritis.  (*Id.* at 135-40.)

Petitioner described her August 20, 2015 pneumococcal vaccination as routine and without pain.  (Tr. 80-81.)  When she got home, she noticed her arm was starting to get warm and it was her husband who first suggested it might be related to the vaccination.  She subsequently began to have swelling and then "fever and all that kind of stuff."  (*Id.* at 81-82.)  She indicates she went to the emergency department the next day, but was told what she was experiencing was normal.  (*Id.* at 82.)

When petitioner returned to her primary care provider, he offered her a prescription.  Petitioner indicates that it reduced her symptoms ("things started going down"), but did not completely resolve her swelling.  (Tr. 82-84.)  Petitioner indicated

that she could not move her left shoulder and explained that "[t]he pain was like – like a terrible pain that you can hardly, you know, do like this and that, like a soreness, and like somebody's ripping your arm off." (*Id.* at 85.)

Petitioner suggested that her physicians were dismissive of her shoulder pain ("they say this and that") up to the time they sent her for an MRI that then showed a tear in her shoulder. (Tr. 85-86.) However, petitioner was confused with regard to when she had an MRI of her shoulder, believing it to have been at her September 9, 2015 hospital encounter. (*Id.* at 87-89.) She asserted that when she went to the hospital on September 9 with complaints of shoulder pain, they said it would go away and that they didn't "pay that much attention to it." (*Id.* at 87.)

Asked about her physical therapy in September and October of 2015, petitioner asserted that she went only one time and then refused to get therapy because the therapist was hurting her arm. (Tr. 91.) (The medical records reflect that petitioner attended six therapy sessions over the course of a month and was discharged because she met her therapy goals. (Ex. 5, p. 1.)) On cross-examination, she was prompted to recall her physical therapy in greater detail and asserted that it was therapy only for her shoulder and that it had been ineffective. (Tr. 129-32.) Petitioner also separately described attending physical therapy with her sister, Yolanda, after receiving her rotator cuff tear diagnosis and similarly described refusing to allow the therapist to touch her arm. (*Id.* at 85-86.)

Petitioner testified that she reminded her primary care physician at subsequent follow ups that she was having shoulder pain, but asserted that he was always too busy to spend more than "just a minute" with her and suggests he may never have written it down. (Tr. 93-94.) She said the doctor "didn't care anymore." (*Id.* at 95.) However, in subsequent testimony, petitioner seemed to suggest that perhaps her references to complaining of arm pain were in the context of nurses attempting to handle her arm to take her blood pressure. (*Id.* at 140-41.)

During cross-examination, petitioner was asked about her December 2015 emergency department encounter for her knee. She denied ever having any knee injury and indicated her husband is the one who has knee problems. She initially asserted that the doctors misattributed his problem to her. After reviewing the medical record (Ex. 3, p. 921), petitioner still did not recall the encounter or injury. (Tr. 132-35.)

Asked about her February 14, 2017 medical encounter, petitioner responded "[t]hat's when he wrote the letter," which she indicated was related to Dr. Bumbaugh believing that she was suing him because of her arm pain. (Tr. 95, 118-19.) She indicated that, at this appointment, she "just opened up to him" about her alleged vaccine injury. (*Id.* at 95.) However, upon further clarification from the court, the letter petitioner was referencing was dated October 31, 2019.[5] (*Id.* at 96-97.) Petitioner's

---

[5] This letter was subsequently filed as Exhibit 32. The letter states "I am writing this letter to inform that Ligia was given Prevnar-13 as a matter of standard immunization as she was 65y/o, only had seasonal allergies, and was given as a prophylactic measure to prevent pneumococcal pneumonia." (Ex. 32, p. 1.)

account of her fall is very difficult to follow.  (*Id.* at 92, 141-43.)  During cross-examination petitioner both denied having fallen at all, but also rationalized that it "had to be my right."  (*Id.* at 143.)  Ultimately, petitioner testified that she did not recall having any fall and that the doctor was mistaken in recording that she had a left shoulder injury, indicating "I don't know where that came out."  (*Id.* at 144-46.)  When petitioner was prompted to review her prior affidavit that described falling on her elbow (Ex. 1, ¶13), she initially disavowed the affidavit, stressing that English is her second language (Tr. 148), but then ultimately conceded "[i]t's a possibility that I fall" (Tr. 149).  Petitioner authenticated the handwritten orthopedic intake form that indicated she suffered a left shoulder injury due to a fall.  (*Id.* at 150-53 (discussing Ex. 6, p. 17).)

Petitioner testified that her shoulder surgery not only did not improve her pain, but actually made it worse.  (Tr. 102.)

### ii.  Rafael Gil

Mr. Gil testified through a translator.  (Tr. 6-7.)  Mr. Gil is petitioner's husband.  They met in 1999.  (*Id.* at 7-8.)  According to Mr. Gil, petitioner was "doing fine" and "[g]enerally speaking, well," prior to the vaccination at issue.  (*Id.* at 8, 16.)  Asked if petitioner had any preexisting back pain, he said no.  (*Id.* at 17.)  Asked if she had any other type of pain prior to vaccination, he said "[s]he had no pain.  None."  (*Id.*)  He described petitioner's initial vaccine reaction as including swelling of her left arm that would not go away.  (*Id.* at 8-9.)  He indicated she still had the problem for months after the vaccination.  (*Id.* at 9.)  He indicated:

> [T]he swelling, the red swelling, went down.  And then after that swelling, well, her arm started to look a little bit different from the other arm, and her crisis she went through of pain and chronic fatigues.  Yeah.  General pain, she herself did not know, migraines or whatever happened to her.

(*Id.*)

Asked directly whether petitioner would report to her physicians that she was experiencing left shoulder pain, Mr. Gil responded:

> Yes.  That's right.  That was her problem.  I mean, everything hurt.  Her arm hurt, everything, and her migraines and chronic – and chronic fatigue, and she lost any type of sensitivity to towards light.  That's exactly it.

---

In blue ink, the letter is altered to indicate that petitioner was not over age 65 at the time of vaccination.  At the time same patient revealed she had a letter from Dr. Bumbaugh, she also presented a separate letter by Dr. Zalenski, dated February 5, 2018, which was later filed as Exhibit 33.  (Tr. 119-21; *see also* Ex. 34; Ex. 11, pp. 87, 90.)  That letter states: "Ligia Gairdo is a 67 year old who had a pneumovax in 2015.  She suffered post injection pain and muscular weakness.  She also has a history of rotator cuff tear in the left shoulder.  She needs to have ongoing physical therapy.  She is making progress in the sessions and still has potential to build strength." (Ex. 33, p. 2.)  Neither of these letters change my interpretation of the medical records as discussed in the analysis below.

(*Id.* at 10.)  Mr. Gil testified that, before the vaccination, petitioner "could do everything," but after vaccination "she cannot use her left arm.  It's very limiting."  (*Id.* at 11, 14-15.)  He did not believe petitioner's arthroscopic surgery helped her condition, noting that the doctor felt petitioner's pain was due to arthritis, which he does not accept.  (*Id.* at 12-13.)

On cross-examination, Mr. Gil was asked what medical providers petitioner saw after her vaccination.  He offered an inconsistent recollection of whether she went to her primary care provider or the emergency department first, then noted "I don't' really remember all that much."  (Tr. 17.)  Mr. Gil acknowledged that petitioner's physical therapy during the period after her vaccination was for her neck, but indicated that during the course of physical therapy, petitioner's shoulder was too painful to be touched.  (*Id.* at 18-19.)  He added "the pain here and the uneasiness is not only because what was caused by the vaccine, but because of the medical inconsistencies and the really crazy things they've done, because by luck or not so much luck, she'd had horrible doctors."  (*Id.* at 19.)

Regarding petitioner's February 2017 fall, Mr. Gil confirmed he was not there at the time.  (*Id.* at 20-22.)  However, he asserted that petitioner had fallen on her right, rather than left shoulder, and that her doctors fraudulently or mistakenly recorded that she fell on her left shoulder.[6]  (*Id.* at 20-21.)  But in any event, he asserted that the pain resolved within a few days with medication.  (*Id.* at 20.)

Mr. Gil's testimony was generally consistent with his previously submitted affidavit.  (Ex. 10.)

### iii.  Yolanda Evans

Yolanda Evans is petitioner's sister.  (Tr. 24-25.)  She testified that prior to vaccination, petitioner "didn't have any problems."  (*Id.* at 26.)  Ms. Evans indicated that, after the vaccination at issue, petitioner told her she was experiencing redness and swelling of her arm.  (*Id.* at 27.)  Ms. Evans indicated that, about a few days after the vaccination, she saw petitioner and saw that her arm was painful and so recommended she go back to the doctor to see what was wrong.  (*Id.* at 27, 43-44.)  She described petitioner's pain as a ten out of ten and confirmed she saw the redness and swelling herself.  (*Id.* at 29-30.)  She could not recall how long the swelling persisted (*Id.* at 43-44); however, she indicated that petitioner could not move or raise her arm and that the pain never went away (*Id.* at 30-31, 50).  After the vaccination she "couldn't work with her left hand . . . . She couldn't do anything with that hand."  (*Id.* at 33.)  Ms. Evans acknowledged petitioner suffered a left shoulder injury in February of 2017 while caring for their mother, but did not know the details.  (*Id.* at 36-38.)  Ms. Evans indicated that petitioner's January 2021 shoulder surgery did not help her pain.  (*Id.* at 38-39.)

---

[6] Petitioner's medical records include a handwritten intake questionnaire in which petitioner wrote that the purpose of her visit was left shoulder pain and, when prompted to explain her injury in detail, she wrote "I was a[t] work bathing the patient, and I fall."  (Ex. 6, p. 17.)

Petitioner would mention the shoulder pain to Ms. Evans and she was sometimes crying when Ms. Evans visited.  (*Id.* at 46.)  Petitioner never mentioned any other type of pain to Ms. Evans.  (*Id.*)  She suggested that "when you have pain and it radiates from there [referring to the arm], you probably forget about everything else until you're alone and you'll be able to think.  But the main focus was the arm.  It was extremely painful."  (*Id.* at 46-47.)  Ms. Evans described petitioner as having attempted physical therapy for her shoulder.  She could not recall when the physical therapy occurred, but indicated it was too painful and petitioner couldn't complete the physical therapy.[7]  (*Id.* at 47-48.)

Ms. Evans's testimony was generally consistent with her previously submitted affidavit.  (Ex. 29.)

### iv.  Marai Gairdo

Marai Gairdo is petitioner's granddaughter.  (Tr. 52-53.)  She lived with petitioner from June of 2016 through April of 2021.  (*Id.* at 54.)  She first found out about petitioner's alleged post-vaccination problems when she moved in with her in June of 2016.  (*Id.*)  She could not recall specifics, but recalled seeing that petitioner was in a lot of pain and was "going through jobs," complaining about her pain and having to work. (*Id.* at 55.)  She recalled petitioner talking about her pain and wincing when moving around the house.  (*Id.* at 55-56.)  Ms. Gairdo recalled her grandmother having difficulty with her left arm from the point she first moved in with her and worsening over time (*Id.* at 58); however, when asked for specifics, she testified that it was "as I got older, like maybe a couple of years or like a year, that's when she had started complaining about her – like the specifics, her arm hurting and like she can't reach for too much."  (*Id.* at 56.)  She did not know exactly what happened when her grandmother was injured caring for her great-grandmother, but did recall that her pain was much worse after that and she "complained a lot" about her left shoulder.  (*Id.* at 56-57, 60.)  After the accident, she described petitioner as "always going to the doctor" and "continu[ing] to complain about pain," culminating in her shoulder surgery.  (*Id.* at 57-58.)  Ms. Gairdo indicated that she is not sure whether petitioner's shoulder surgery helped her.  (*Id.*) She characterized left shoulder pain as petitioner's "main pain," observing that she might also have complained of age-related back pain.  (*Id.* at 59.)

Ms. Gairdo's testimony was generally consistent with her previously submitted affidavit.  (Ex. 31.)

### v.  Mary Gairdo

Mary Gairdo is petitioner's daughter.  (Tr. 62-63.)  She was living with petitioner during 2015 and until sometime in 2017.  (*Id.* at 65-66, 68.)  She testified that

---

[7] Given that Ms. Evans could not recall when petitioner did this physical therapy, it is more likely she is referring to the physical therapy that petitioner reported having done during May and June of 2017.  (Ex. 7, p. 19.)  Whereas petitioner reported that this later physical therapy from May and June of 2017 was not helpful, her records reflect that she was discharged from her prior physical therapy from September and October of 2015, which was for her neck, rather than her shoulder, because she had made good progress.  (Ex. 5, p. 2.)

petitioner's only medical issues prior to vaccination were gastric issues.  (*Id.* at 64.)
Asked to describe what happened to her mother's health following the vaccination at
issue, she indicated "it was like a slow decline.  More and more time goes by, she was
just suffering from other stuff.  Chronic fatigue, unable – her arm constantly hurting.
The reason I know that is she constantly was in pain, and I saw her." (*Id.* at 65.)  She
testified that petitioner's left shoulder pain began "right after she had got the shot."  (*Id.*
at 67.)  Ms. Gairdo was not aware of petitioner having any pain relief from her shoulder
surgery.  (*Id.* at 70.)  She did recall petitioner complaining that her doctors were not
addressing her concerns.  (*Id.* at 75.)

> However, in her previously submitted affidavit, Ms. Gairdo also explained:

> I've struggled with miscommunication between myself and my mother as
> her first language is Spanish, and when these problems started, I didn't
> really understand what she was going through at the time.  It put a strain on
> our relationship.  I stopped talking to my mother several times due to last
> minute cancellations by my mother in times when I desperately needed her.
> She told me she was fatigued and in pain each of those times, and I wasn't
> understanding how significantly her left shoulder had been affecting her and
> her ability to interact with me.  I feel so sorry now, to finally realize that her
> shoulder condition never improved since the time of her vaccination.

(Ex. 30, pp. 1-2.)

## IV.   Expert Opinions

Because the analysis below turns on my fact finding, it is not necessary to
address the expert reports at length.  Briefly, petitioner's expert, Daniel Carr, M.D.[8],
premised his opinion on the idea that petitioner's initial vaccine reaction included pain
and weakness in the shoulder that persisted up to the time of her February 2017 fall.
(Ex. 23, pp. 6-7.)  He opines that the pain and weakness in petitioner's shoulder
contributed to the fall.  (*Id.*)  Thus, petitioner's rotator cuff tear and arthroscopic surgery
of January 2021 were indirectly related to the vaccination, even if they originated at the
time of the fall.  (*Id.*)  Dr. Carr describes petitioner's initial vaccine reaction as an allergic
reaction inclusive of left upper arm pain with swelling and redness.  (*Id.* at 4.)  By
contrast, respondent's expert, Paul Cagle, M.D. [9], is critical of Dr. Carr's review of the

---

[8] Dr. Carr received his medical degree from the University of Vermont in 1980, before going on to
complete an internship in general surgery at the University of Utah in 1981, followed by a residency in
orthopedic surgery at the University of Vermont in 1985.  (Ex. 24, p. 1.)  He is board certified orthopedic
surgeon and subspecializes in sports medicine, shoulder, and traumatic injuries.  (*Id.*; Ex. 23, p. 1.)
Although Dr. Carr is currently retired from active surgical practice, he continues to consult and care for
orthopedic patients at the College of William and Mary and provide volunteer surgical care at St. Vincent
and The Grenadines.  (*Id.* at 1-2; Ex. 24, pp. 1-2.)  He also maintains a position on the Medical Advisory
Board Care Team Health.  (Ex. 23, p. 2; Ex. 24, p. 2.)

[9] Dr. Cagle received his medical degree from Loyola University Chicago Stritch School of Medicine in
2008, before going on to complete a residency in orthopedic surgery at the University of Minnesota
Academic Health Center and Medical School in 2013, as well as a shoulder and elbow fellowship at

medical records for shoulder symptoms and also contends that the mechanism of allergic reaction proposed by Dr. Carr is neither consistent with SIRVA nor otherwise substantiated.  (Ex. A, p. 7.)  The experts further discussed their disagreements in subsequent reports.  (Exs. 35, 52, B.)

## V.    Analysis

In her motion, petitioner asserts both that she suffered a Table Injury of SIRVA and that she has satisfied the three-part *Althen* test based on the opinion of her expert, Dr. Carr.  (ECF No. 109, pp. 23-25; ECF No. 120, pp. 3-9.)  Under either approach, petitioner premises her claim on her allegation that she suffered persistent left shoulder pain within one day of her vaccination.  (ECF No. 109, pp. 24-25.)  Respondent, however, contends that petitioner's initial vaccine reaction did not include left shoulder pain and that petitioner did not suffer shoulder pain until February of 2017, following a fall.  (ECF No. 114, pp. 21-27.)  Because I agree with respondent, my fact finding on this point is dispositive.

Pursuant to the Vaccine Act, § 300aa-13(a)(1)(A), a petitioner must prove their claim by a preponderance of the evidence.  A special master must consider the record as a whole, but is not bound by any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record.  § 300aa-13(b)(1).  However, the Federal Circuit has held that contemporaneous medical records are ordinarily to be given significant weight due to the fact that "[t]he records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium.  These records are also generally contemporaneous to the medical events."  *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Yet, this precept is not absolute.  *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1382-83 (Fed. Cir. 2021) (stating that "[w]e reject as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions").  Medical records are afforded substantial weight when they are clear, consistent, and complete.  *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  Afterall, "[m]edical records are only as accurate as the person providing the information."  *Parcells v. Sec'y of Health & Human Servs.*, No. 03-1192V, 2006 WL 2252749, at *2

---

Mount Sinai Hospital in New York, New York, and an additional shoulder fellowship at Private Hospital Jean Mermoz/Centre Orthopaedic Santy in Lyon, France, in 2014.  (Ex. C, p. 1.)  He is a board certified orthopedic surgeon.  (*Id.*)  He currently works as an associate professor and associate program director in the Department of Orthopedic Surgery at the Icahn School of Medicine at Mount Sinai.  (*Id.*; Ex. A, p. 1.)  He is a member of the American Shoulder and Elbow Surgeons, as well as a member of the American Academy of Orthopaedic Surgeons and the American Orthopaedic Association.  (Ex. A, p. 1.)  As a faculty member of an internationally recognized shoulder surgery fellowship, Dr. Carr is involved in teaching and educating medical students, graduate students, and orthopedic surgical residents.  (*Id.*)  He also conducts clinical, biomedical, and basic science research.  (*Id.*)  He has published over 90 publications and provided over 50 presentations pertaining to shoulder-related injuries.  (Ex. C, pp. 4-19.)

(Fed. Cl. Spec. Mstr. July 18, 2006).  In *Lowrie*, the special master wrote that "[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent."  2005 WL 6117475, at *19 (quoting *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992)).  Importantly, however, "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance."  *Murphy*, 23 Cl. Ct. at 733 (quoting the decision below).

In this case, petitioner's medical records are very clear in reflecting several distinct issues.  First, petitioner had back and neck problems prior to the vaccination at issue – she specifically mentioned these complaints at the appointment at which she was vaccinated.  (Ex. 2, pp. 78, 82.)  In that regard, she began treating for cervical spinal complaints beginning in September of 2015.  (*Id.* at 107-08.)  Second, petitioner has complained of chronic all-over body pain that she attributed to fibromyalgia.  (*Id.* at 78; Ex. 3, p. 46.)  These pains also predated her vaccination as she indicated that she suspected she had fibromyalgia at the time of the vaccination at issue.  (Ex. 2, p. 82.)  Third, petitioner suffered a reaction to her vaccination that consisted of constitutional symptoms such as fever, as well as a localized injection site reaction/infection with redness and swelling.  (*Id.* at 99-100.)  There is no contemporaneous evidence that this reaction included left shoulder dysfunction or that it persisted beyond a few weeks.  That is, while her August 26, 2015, encounter indicates she was still symptomatic, no subsequent records confirmed any ongoing symptoms (*Id.*)  Despite petitioner asserting her arms remained different sizes after that, her physician confirmed by visual inspection that this was not the case.  (*Id.* at 156.)  Fourth, petitioner began complaining of left shoulder pain and reduced range of motion after experiencing a fall in February of 2017, leading to arthroscopic surgery to repair a suspected rotator cuff tear, though the surgery ultimately found degenerative changes and an intact rotator cuff.  (*Id.*; Ex. 6, p. 2; Ex. 21, pp. 28, 76-77.)  Although petitioner also vaguely complained of ongoing effects of her vaccination, the contemporaneous treatment records from February of 2017 are explicit in associating petitioner's left shoulder condition to her fall and in describing a distinct onset of left shoulder symptoms, including reduced range of motion, at that time.  (Ex. 2, p. 156.)

Petitioner asserts that her alleged vaccine-injury contributed to her fall in February 2017 because she had pain and weakness in her left shoulder ever since the time of vaccination.  (Ex. 1, ¶ 7.)  However, the medical records generated between the time of her vaccination and her fall not only fail to document any such pain and weakness, but actually confirm by physical examination that petitioner had full range of motion and full strength of her upper extremities.  (Ex. 3, p. 47.)  She also had full strength in her left shoulder when she was seen by the orthopedist following her fall.  (Ex. 6, p. 3.)  To the extent she complained that her left arm remained larger than her right arm after vaccination, suggesting her swelling had never fully resolved, Dr. Bumbaugh disagreed based on his direct observation.  (Ex. 2, p. 156.)  Moreover, during the hearing petitioner authenticated the handwritten intake questionnaire that specifically indicates that petitioner began experiencing left shoulder pain in February of

2017 when she fell.  (Tr. 150-53 (discussing Ex. 6, p. 17).)  That document is strong evidence in itself.  *Demitor v. Sec'y of Health & Human Servs.*, No. 17-564V, 2019 WL 5688822, at *10 (Fed Cl. Spec. Mstr. Oct. 9, 2019) (explaining "the history reflected in the record of petitioner's January 23, 2015 chiropractic visit derives from her own handwritten intake form.  Thus, it cannot be said to reflect any transcription mistake or miscommunication on the part of the chiropractor or his office.  Nor can petitioner reasonably suggest that she was incompletely or incorrectly paraphrased.  Rather, the report of a '1 month' onset is her own report verbatim.").  When petitioner first presented to Dr. Bumbaugh after the fall, she did reference ongoing discomfort in her arm dating back to her vaccination (Ex. 2, pp. 156-60); however, it is difficult to separate this report from her complaints of fibromyalgia and cervical issues, neither of which can be associated to her vaccination (*see supra* note 3).  This medical record also documents a new onset of reduced range of motion.

Although there is testimony in this case suggesting that petitioner's physicians were dismissive of petitioner's concerns or ineffectual, I find nothing on this record to support that assertion and do not find that assertion credible.  For example, during the hearing, petitioner extensively denied having fallen in February of 2017 and attributed that history to a mistake by her physician.  (Tr. 143-46.)  Ultimately, however, as noted above, she authenticated her own handwritten intake form as including that history.  Despite petitioner testifying that her physicians were not recording her complaints (Tr. 93-95), the medical records repeatedly document instances where petitioner attributed symptoms to her vaccination (Ex. 2, pp. 144, 156; Ex. 3, p. 46; Ex. 7, p. 36; Ex. 12, p. 2).  Accordingly, the contemporaneous medical records are entitled to substantial weight as they are clear, consistent, and complete.

I have also considered the witness testimony available in this case that indicates petitioner had persistent pain and reduced range of motion in her left shoulder following vaccination.  However, it is not sufficient to overcome the weight due the contemporaneous medical records.  When witness testimony is offered to overcome the weight afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling."  *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).  Further, the special master must consider the credibility of the individual offering the testimony.  *Andreu ex rel. Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).  In determining whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony, there must be evidence that this decision was the result of a rational determination.  *Burns ex rel. Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 416-17 (Fed. Cir. 1993).  The special master is obligated to consider and compare the medical records, testimony, and all other "relevant and reliable evidence" contained in the record.  *La Londe v. Sec'y Health & Human Servs.*, 110 Fed. Cl. 184, 204 (2013) (citing § 300aa-12(d)(3); Vaccine Rule 8), *aff'd sub nom. LaLonde v. Sec'y of Health & Human Servs.*, 746 F.3d 1334 (Fed. Cir. 2014); *see also Burns*, 3 F.3d at 417.

Petitioner's testimony is not reliable in that she demonstrated that she does not herself have a good recollection of the timeline of events.  For example, petitioner could not recall at all her December 2015 emergency encounter for her left knee.  (Tr. 132-35.)  She was confused with respect to when she underwent an MRI study for her left shoulder.  (*Id.* at 85-89.)  She did not recall that she attended six physical therapy sessions in September and October of 2015 and misattributed that therapy to her shoulder, rather than her cervical spine.  (*Id.* at 90-91, 129-31.)  Additionally, petitioner offered denials of important facts that simply were not credible.  For example, petitioner would not acknowledge that she did, in fact, experience a fall in February of 2017, until she was confronted with her own earlier affidavit that acknowledged the fall.  (*Id.* at 143-49.)  Petitioner denied that she ever had fibromyalgia or that she ever reported having fibromyalgia (*Id.* at 144-45); however, petitioner's belief that she had fibromyalgia is documented repeatedly in medical records from two different physicians.  (Ex. 2, pp. 82, 156, 159; Ex. 7, p. 22.)  Petitioner denied having any history of back pain (Tr. 127-28); however, she complained of back pain at the encounter at which she received the subject vaccination (Ex. 2, pp.81-82), her prior medical records confirm lumbar spinal stenosis (Ex. 2, pp. 8, 23, 30, 48, 56, 64), she specifically sought treatment for lower backpain in 2016 (Ex. 6, pp. 5, 7-8), and a handwritten orthopedic intake form from her 2016 encounter signed by petitioner indicates she has had back pain since 2009 (*Id.* at 23).

To accept petitioner's testimony, one would have to conclude that petitioner experienced a sustained pattern of care wherein her physicians willfully ignored her primary complaint of shoulder pain while simultaneously being attentive to, and treating, multiple other complaints she did not have.  Even accounting for any potential language barrier between petitioner and her physicians, it is far more likely that petitioner's recollections are simply incorrect.  Considering all the issues with petitioner's testimony collectively, and comparing the testimony against the records, petitioner has likely come to inaccurately perceive her much longer medical history, with various complaints beginning at different times both before and after vaccination, into a more condensed timeline befitting what she considers to be a post-vaccination reaction broadly affecting her musculature.  (*E.g.*, Ex. 14, p. 2 (asserting on a form, dated July 31, 2019, that chronic pain and numerous other symptoms all began immediately after vaccination); Ex. 11, pp. 73-74 (placing left shoulder complaint in the context of broader complaints of muscle weakness); Ex. 7, p. 36 (retracting prior suspicion of fibromyalgia in favor of a vaccine reaction affecting her muscles).)  Given that petitioner did experience an initial, more limited, post-vaccination reaction, and given that she did subsequently suffer over the ensuing years, it is somewhat understandable that petitioner could come to perceive her history this way.  However, that does not render her recollection either credible or reliable.

The additional witness testimony does not help to resolve these issues.  Though the witnesses were all uniform in asserting the single point that petitioner had shoulder pain shortly after vaccination, they did not otherwise provide clear, consistent, or compelling testimony when providing further explanation.  Mr. Gil offered some

testimony consistent with petitioner's account; however, he was not able to recall many details.  (Tr. 17.)  He did, however, contradict petitioner's testimony in confirming that her physical therapy during September and October of 2015 was for her neck, rather than her shoulder.  (*Id.* at 18-19.)  Like petitioner, however, he incorrectly asserted that petitioner's doctors mis-recorded that she fell on her left elbow/shoulder in February of 2017.  (*Id.* at 20-21.)  Ms. Evans's testimony largely serves to corroborate petitioner's initial vaccine reaction, inclusive of her red, swollen arm, which is not disputed. Although she testified that petitioner suffered a painful left shoulder, her testimony was not detailed and many of her recollections do relate to the period after petitioner fell. Mary Gairdo, though she testified that petitioner had shoulder pain from the point of vaccination, had indicated in her prior affidavit that she actually did not understand what petitioner was experiencing at the time, suggesting she only belatedly became aware of petitioner's alleged shoulder pain.  (Ex. 3, pp. 1-2.)  She otherwise testified that what petitioner experienced "was like a slow decline.  More and more time goes by, she was just suffering from other stuff." (Tr. 65.)  Marai Gairdo, who lived with petitioner beginning in June of 2016, testified that petitioner did not begin complaining about her left shoulder until about a year after she had moved in, which would place the onset after petitioner's fall.  (*Id.* at 54-55.)

I have also considered petitioner's expert's interpretation of the medical records, but am unpersuaded.  Dr. Carr asserts without substantiation that petitioner's initial vaccine reaction included left shoulder pain and weakness beyond her initial cellulitis, seeming to merely conflate petitioner's diagnosis of an allergic reaction with the presence of a shoulder injury.  (Ex. 35, pp. 1-2.)  Especially of note, Dr. Carr interprets petitioner's September 9, 2015 emergency department encounter as reflecting medical attention for "pain in her left arm that limited her from doing daily activities and had now caused radiation of symptoms to the posterior side of the neck." (Ex. 23, p. 4.)  This is a complete inversion of petitioner's actual presentation.  The medical record reflects that petitioner presented for bilateral neck pain extending to the trapezius.  (Ex. 3, p. 46.) This history specifically denies any pain radiating into petitioner's arms and the physical exam confirmed both that the cervical spine was the source of petitioner's pain and that she had normal range of motion and full strength in her upper extremities.  (*Id.* at 47-48.)  When petitioner followed up with Dr. Bumbaugh, he did note pain affecting the left shoulder, but the focus of this record remained on petitioner's cervical spine.  (Ex. 2, pp. 107-08.)  Dr. Cagle opines this is consistent with cervical spine pathology (Ex. A, p. 6), but Dr. Carr dismisses the presence of cervical spine arthritis because the CT findings were not severe and because it would not explain petitioner's left arm edema (Ex. 35, pp. 2-3.)  However, petitioner's September 16, 2015, encounter with Dr. Bumbaugh does not document any edema.  (Ex. 2, pp. 107-111.)  But in any event, there has been no suggestion that petitioner's cervical issues would explain the left arm swelling and redness otherwise attributable to petitioner's undisputed vaccine reaction/cellulitis.  The question is whether any discernable shoulder pathology is evidenced prior to her February 2017 fall, especially given that only sparse (and often vague) reports of post-vaccination symptoms are reported, and given the presence of multiple other, better documented, complaints during that period, including her potential vaccine-caused cellulitis, cervical spinal issues, and muscle aches reported as fibromyalgia.

For all the reasons discussed above, there is not preponderant evidence of any shoulder injury pre-dating petitioner's February 2017 traumatic fall. Thus, because Dr. Carr's opinion is based on factual assumptions that are not preponderantly supported, I do not credit his opinion as to vaccine causation. *Burns*, 3 F.3d at 417 (holding that "[t]he special master concluded that the expert based his opinion on facts not substantiated by the record. As a result, the special master properly rejected the testimony of petitioner's medical expert."); *see also Rickett v. Sec'y of Health & Human Servs.*, 468 Fed. App'x 952, 958 (Fed. Cir. 2011) (holding that "it was not error for the Special Master to assign less weight to Dr. Bellanti's conclusion regarding challenge-rechallenge to the extent it hinged upon Mr. Rickett's testimony that was inconsistent with the medical records"); *Dobrydnev v. Sec'y of Health & Human Servs.*, 566 Fed. App'x 976, 982-83 (Fed. Cir. 2014) (holding that the special master was correct in noting that "[w]hen an expert assumes facts that are not supported by a preponderance of the evidence, a finder of fact may properly reject the expert's opinion" (alteration in original) (quoting the decision below)); *Bushnell v. Sec'y of Health & Human Servs.*, No. 02-1648V, 2015 WL 4099824, at *12 (Fed. Cl. Spec. Mstr. June 12, 2015) (finding that "because Dr. Marks' opinion is based on a false assumption regarding the onset of J.R.B.'s condition, and the incorrect assumption of a 'stepwise regression' after each vaccine administration, it should not be credited").

## VI.   Conclusion

Considering the record as a whole, the evidence preponderates in favor of a finding that, although petitioner experienced a transitory vaccine reaction and possible cellulitis, that condition resolved in less than six months. During the same period, petitioner suffered cervical spinal symptoms that were mostly alleviated by physical therapy; however, petitioner did not begin suffering symptoms of any potential shoulder injury until she experienced a traumatic fall in February of 2017. Because there is not preponderant evidence that petitioner had vaccine-related pain and weakness in her shoulder prior to her fall, there is not preponderant evidence that her fall was in any way attributable to her vaccination. Petitioner may or may not also have fibromyalgia; however, the evidence confirms she felt she had symptoms she believed to be fibromyalgia prior to the vaccination at issue.

Even though these findings do not implicate petitioner's vaccination as a cause of any of her medical issues, they do reflect that petitioner has experienced some difficult and painful years. For that she has my sympathy. Nothing in this decision is intended to minimize what petitioner has experienced. However, for all the reasons discussed above, there is not preponderant evidence of any compensable vaccine injury. Accordingly, this case is dismissed.[10]

---

[10] In the absence of a timely-filed motion for review of this Decision, the Clerk of the Court shall enter judgment accordingly.

**IT IS SO ORDERED.**

<u>**s/Daniel T. Horner**</u>
Daniel T. Horner
Special Master